UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANDREW TALBERT,  
Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

Case No. 1:15-cv-468
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's statement of errors (Doc. 10), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply memorandum (Doc. 16).

## I. Procedural Background

Plaintiff filed his applications for DIB and SSI in March 2013, alleging disability since December 31, 2009, due to blindness in the left eye and two strokes. These applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ) Robert Flynn. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On April 13, 2015, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

2

perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2013.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since December 31, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: cerebrovascular accident with residual of left upper extremity deficits; left rotator cuff tear; left hemiparesis; left eye blind; hepatitis C; fracture of the left radius; obesity; and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the [plaintiff] has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), and more particularly: lift up to 20 pounds and frequently lift or carry 10 pounds; stand/walk for 6 hours in an 8-hour work day; and sit for 6 hours in an 8-hour work day. In addition, he cannot climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs. He [can] occasionally balance, stoop, crouch, kneel and crawl, but cannot push/pull, reach – including overhead reach, handle, finger or feel with his left upper extremity. Further, the [plaintiff] is limited to jobs that do not involve depth perception, do not require left peripheral acuity or exposure to hazards, such as unprotected heights, commercial driving or the use of moving machinery. Moreover, the [plaintiff] is limited to work that involves simple, routine and repetitive 1-2 step tasks; performed in a low stress environment, defined as free of fast-paced production requirements, involves only simple work-related decisions, has few – if any – work place changes, and only occasional interaction with supervisors.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1961 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The [plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from December 31, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 28-40).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[1] Plaintiff's past relevant work was as a chicken cleaner/processer, a light level position; a hand packager, a medium level position; and a material handler and rough grinder, heavy level positions. (Tr. 39).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light occupations such as an usher (700 jobs locally, 87,000 jobs nationally). (Tr. 40).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ erred in failing to find plaintiff entitled to benefits at Step 3 of the sequential evaluation under application of Listing 12.05C, with the Appeals Council likewise erring in also failing to reach such determination; (2) the ALJ's RFC is not supported by substantial evidence; and (3) the ALJ's reliance upon the vocational testimony was misplaced and constitutes a separate error as there are not a significant number of jobs that plaintiff could perform. (Docs. 10 and 16).

5

### 1. The ALJ's 12.05 Listing determination is supported by substantial evidence.

Listing 12.05 contains an introductory paragraph with the diagnostic description of "intellectual disability" and four sets of criteria set forth in paragraphs (A)-(D). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Listing 12.05 provides in relevant part:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet Listing 12.05 for intellectual disability, the impairment must satisfy both the diagnostic description and any one of the four sets of criteria. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A)). In satisfying the diagnostic description for intellectual disability, a claimant must demonstrate: (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning; and (3) such deficits in adaptive functioning initially manifested before age 22. *Id*. "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). See also *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) ("The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas:

6

communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'") (quoting Diagnostic and Statistical Manual of Mental Disorders, p. 49 (4th ed. 2000)). For purposes of Listing 12.05C, the Social Security regulations direct that the lowest score of an IQ test's multiple components be used: "Where verbal, performance and full scale IQ's are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00 D(6)(c).

The ALJ determined that plaintiff did not meet the requirements of Listing 12.05C. The ALJ stated:

> [T]he 'paragraph C' criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. As noted above, the claimant's full scale IQ was found to be 67, but the psychologist noted that the likelihood that his true Full Scale IQ was within the range of scores between 64-72 are 95 chances out of 100 (14F/8). However, the claimant showed 'some mild variability' and no other records indicated a low IQ score. Furthermore, the claimant had no school records indicating that he was in special education classes, though he stated he was, and no other medical records showed a mental impairment with below average intellect. Indeed, at a physical consultative examination, it was noted that his level of intellectual functioning was normal (7F/6).

(Tr. 32).

Plaintiff contends he meets Listing 12.05C for intellectual disability because he has: (1) qualifying IQ scores; (2) significantly subaverage general intellectual functioning with deficits in adaptive functioning which manifested prior to age 22; and (3) additional functional limitations resulting from other severe impairments. Plaintiff argues that the report of the consultative psychologist, Dr. Kenford, and his school records establish he meets Listing 12.05C. Plaintiff also argues that the ALJ improperly relied on a comment contained in a report of a physical

7

consultative examination that plaintiff's intellectual functioning seemed normal.

Dr. Kenford performed a consultative examination in August 2013. She administered IQ testing which yielded a Full Scale IQ score of 67. (Tr. 793). Dr. Kenford opined that this score fell in the "Extremely Low range" of intelligence and there was a 95% likelihood that plaintiff's true score is within the range of scores between 64 to 72. (*Id.*). Dr. Kenford noted that plaintiff displayed mild variability across his Composite scores. (*Id.*). Dr. Kenford stated that on formal intellectual and memory testing, plaintiff scored in the primarily Borderline range and this was consistent with his description of his premorbid functioning. (Tr. 795). Dr. Kenford also stated it would be helpful to have school records to compare IQ scores he obtained as a youth. (*Id.*). Dr. Kenford opined that although plaintiff's Full Scale IQ score fell in the Extremely Low range, there was no evidence of adaptive behavior deficits during plaintiff's developmental years so a diagnosis of Mild Mental Retardation was not appropriate. (*Id.*). Dr. Kenford diagnosed Alcohol Dependence and Borderline Intellect, and she assessed a GAF of 60. (*Id.*).

Plaintiff's school records show that in 1972, when he was in the fifth grade, plaintiff obtained an Otis Lennon Test IQ score of 72. (Tr. 487). Stanford Achievement Test scores in the sixth grade revealed grade equivalents ranging from 3.0 in vocabulary and word study skills to 5.7 in science and listening comprehension. (Tr. 492). When plaintiff was in the seventh grade, he tested at below the fifth grade level in most areas on the Stanford Achievement Test. (Tr. 487). Plaintiff testified and reported to the two psychological consultative examiners that he attended special education classes. (Tr. 69, 689, 789). Plaintiff's school records, however, do

not on their face indicate that plaintiff was in special education classes.[2]

Substantial evidence supports the ALJ's determination that plaintiff did not meet or equal Listing 12.05C. Dr. Kenford's testing showed an IQ score of 67, which was of listing level severity, and there is no indication from Dr. Kenford's report that the IQ testing was invalid. Nevertheless, for plaintiff to meet Listing 12.05C, he must satisfy all of the requirements of the diagnostic description for intellectual disability. *Foster*, 279 F.3d at 354. Substantial evidence supports the ALJ's finding that plaintiff failed to demonstrate significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period as mandated by the diagnostic description for Listing 12.05. Dr. Kenford opined that a diagnosis of Mild Mental Retardation was not appropriate because she found no evidence of adaptive behavior deficits during plaintiff's developmental years. (Tr. 795). Instead, Dr. Kenford diagnosed borderline intellect, along with alcohol dependence, and reported that plaintiff "scored in the primarily Borderline range" on formal intellectual and memory testing. (*Id.*). Dr. Kenford reported that this was "consistent with his description of premorbid functioning." (*Id.*). While Dr. Kenford opined that it would have been helpful to compare her test results with those obtained when plaintiff was a youth, she nevertheless acknowledged plaintiff's report that he had been in special education classes "suggesting he has always had Borderline intellect." (*Id.*). No psychologist diagnosed plaintiff with mental retardation and the

---

[2] Plaintiff cites to evidence from the school district's records custodian which indicates the classes plaintiff attended were indeed special education classes. (Tr. 509). This evidence was not part of the administrative record before the ALJ, but was submitted by plaintiff to the Appeals Council. It is well settled that where "the Appeals Council considers the new evidence but declines to review the case," as it did in this case, the District Court may only consider the new evidence in determining if remand is appropriate under Sentence Six of 42 U.S.C. § 405(g). *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). *See also Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)). Accordingly, the Court may not consider this evidence on its substantial evidence review. In addition, plaintiff is not entitled to a Sentence Six remand under 42 U.S.C. § 405(g) as this evidence is not considered "new." *Foster*, 279 F.3d at 357. Plaintiff has not met his burden of showing that this evidence was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).

only psychologists who examined plaintiff opined that plaintiff functioned in the borderline range (Dr. Kenford) or the low average range of intelligence (Dr. Stockel). (Tr. 795, 691). Although a formal diagnosis of mental retardation is not dispositive of whether plaintiff meets Listing 12.05C, the absence of the diagnosis is probative for the Listing 12.05 analysis. *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007)).

In addition, plaintiff's school records from the fifth grade show an IQ of 72, which is consistent with Dr. Kenford's finding of borderline intellectual functioning. Plaintiff contends that the IQ of 72 obtained on Otis Lennon testing is within the range of variability identified by Dr. Kenford, suggesting that his IQ at that time could very well have been of listing level severity. However, the converse could equally be true, i.e., that his "true" IQ was actually above 72 based on the range of variability. In any event, plaintiff has not provided evidence that the IQ score obtained on Otis Lennon testing reflects the same degree of functioning as the scores obtained on the Wechsler test. *See* 20 C.F.R. Part 404, Subpt. P, § 12.00(D)(6) ("Due to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series.").

Plaintiff also contends his school records show a history of poor academic performance and support a finding of deficits in adaptive functioning before age twenty-two. However, it is not clear from plaintiff's school records whether his average to poor grades were the result of an intellectual disability or, by his own admission, excessive absences from school. (Tr. 486, 488, 689). Moreover, even assuming plaintiff was placed in special education classes, "neither

10

circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two." *Peterson*, 552 F. App'x at 540 (citations omitted). Where, as here, substantial evidence supports the conclusion reached by the ALJ, the Court must affirm even where there is sufficient evidence to reach an opposite conclusion. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Plaintiff's first assignment of error should be overruled.

### 2. The ALJ's RFC is supported by substantial evidence.

Plaintiff contends the ALJ erred by finding he has the RFC for light work given his significant residual impairment with his left arm and hand from his March 2013 stroke and left shoulder rotator cuff tear. Despite the ALJ's finding that plaintiff had no effective use of his left upper extremity, the ALJ nonetheless determined that plaintiff retained the RFC for a range of light work, which requires lifting up to 20 pounds. Plaintiff alleges the ALJ incorrectly based this determination, in part, on his testimony that he could do some housework, run a vacuum cleaner, and cook for himself when plaintiff's testimony reveals he actually performed these activities with his right hand and arm. Plaintiff argues that without effective use of his left arm, he is limited to the use of one hand and arm and common sense dictates he would not be able to do light work which requires lifting and carrying up to 20 pounds. Plaintiff contends that Social Security Ruling 83-12 describes the vocational implications for the loss of major use of an upper extremity and compels a finding that plaintiff should be limited to sedentary work. Plaintiff contends that he is capable of, at most, a restricted range of sedentary work which would render him disabled under Grid Rule 201.10. (Docs. 10, 16).

In relevant part, the ALJ determined that plaintiff has the RFC for a range of light work

11

as defined in 20 CFR §§ 404.1567(b) and 416.967(b), in that he could "lift up to 20 pounds and frequently lift or carry 10 pounds; stand/walk for 6 hours in an 8-hour work day; and sit for 6 hours in an 8-hour work day. In addition, he cannot climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs. He [can] occasionally balance, stoop, crouch, kneel and crawl, but *cannot push/pull, reach – including overhead reach, handle, finger or feel with his left upper extremity*." (Tr. 32) (emphasis added). Thus, as plaintiff correctly points out, the ALJ essentially determined that plaintiff was limited to use of only one arm.

Social Security Ruling 83-12 describes the ramifications on the occupational base for individuals who do not have use of an upper extremity:

> 2. Loss of Use of an Upper Extremity
>
> A person who has lost the use of an arm or hand because of amputation, paralysis, etc., obviously cannot perform jobs which require use of both arms or both hands. Loss of major use of an upper extremity is rather definitive in that there is a considerable absence of functional ability. . . .
>
> Experience with persons who have lost the use of an upper extremity has shown that their potential occupational base is between the occupational bases for Table No. 1 (sedentary work) and Table No. 2 (light work). While individuals with this impairment have been known to perform selected occupations at nearly all exertional levels, the total number of occupations within their RFC's is less than the number represented by a full or wide range of light work. These individuals would generally not be expected to perform sedentary work because most unskilled sedentary jobs require good use of both hands. Persons who have the least remaining function would have only the lower occupational base, while those who have the most remaining function would have some of the higher occupational base added in terms of numbers of jobs which can be performed with this type of impairment. Given an individual's particular RFC, a VS [vocational expert] will be able to determine the size of the remaining occupational base, cite specific jobs within the individual's RFC, and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country.

SSR 83-13, Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules Framework for Evaluating Exertional Limitations Within Range of Work or

12

Between Ranges of Work, 1983 WL 31253, at *4.

Plaintiff argues that the RFC restrictions on his left arm functioning place him squarely into the category of individuals who have the "least remaining function" as described in SSR 83-12, meaning he would be limited to the "lower occupational base" of sedentary work, which requires lifting no more than 10 pounds at a time. The ALJ, in contrast, determined that although plaintiff's occupational base was reduced by his nonexertional limitations, he nonetheless retained the exertional capacity for light work. The ALJ's decision in this regard is supported by substantial evidence.

None of plaintiff's treating or examining sources imposed *exertional* restrictions on plaintiff's ability to use his left upper extremity (to lift and carry) greater than those imposed by the ALJ. The ALJ's decision that plaintiff has the exertional capacity for light work is supported by the November 2013 opinion of John Mormol, M.D., the state agency physician who reviewed plaintiff's medical record on reconsideration. Dr. Mormol opined that due to plaintiff's stroke with left side weakness, plaintiff was limited to light work with additional nonexertional limitations. (Tr. 235). The ALJ gave some weight to Dr. Mormol's opinion, but further restricted plaintiff's RFC for light work by imposing additional nonexertional restrictions based on medical evidence that post-dated Dr. Mormol's opinion. This later evidence included a letter from plaintiff's occupational therapist, David Baird, who opined that plaintiff's left upper extremity is significantly impaired. (Tr. 1255). Mr. Baird reported that plaintiff scored 27.6 on the standard deviation from the normal (between -1 and 1) on the Jebsen Taylor Hand Function test; plaintiff has "great difficulty manipulating objects with his left hand"; and plaintiff suffers from "left neglect," a unilateral visual impairment resulting from plaintiff's stroke that causes an inability to process and perceive stimulation on the left side. (Tr. 35, 1255). The ALJ also

13

considered records from 2014 showing continued complaints of left shoulder pain and diminished strength and left upper extremity spasticity secondary to plaintiff's previous stroke and small rotator cuff tear of the infraspinatous. (Tr. 35, 1265, 1269, 1273, 1280-81). The ALJ reasonably considered plaintiff's daily activities, which included household chores, vacuuming, and cooking (with his right hand and arm) (Tr. 37, 77-78, 83, 453), as well as plaintiff's testimony that the stroke did not affect his right hand or arm at all (Tr. 79).

SSR 83-12 does not compel a different conclusion. Where, as here, plaintiff's RFC fell somewhere between the sedentary and light levels of exertion, the grid rules do not apply and it is incumbent upon the ALJ to obtain evidence from a vocational expert to clarify the implications on plaintiff's occupational base. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003) (analyzing SSR 83-12). This is precisely what the ALJ did in this case. In the absence of any evidence showing that any medical source imposed greater exertional restrictions on plaintiff than those imposed by the ALJ, the Court cannot find any error in the ALJ's RFC determination. Plaintiff's second assignment of error should be overruled.

### 3. The ALJ's Step Five determination is not supported by substantial evidence.

At Step Five of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The Social Security Act provides that "work which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). The Commissioner may meet her burden of identifying other work the claimant can perform through reliance on a VE's testimony in response to a hypothetical question.

14

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

Plaintiff contends the ALJ erred by relying on unreliable vocational testimony to meet the Commissioner's burden at Step Five of the sequential evaluation process to show that other jobs exist in substantial numbers that plaintiff can perform despite his medical impairments taking into account the claimant's RFC, age, education, and work experience. The Commissioner, in response, argues that the ALJ's finding is supported by substantial evidence because the ALJ properly relied upon the VE's testimony.

The ALJ asked the VE to assume an individual with limitations that essentially tracked the RFC adopted by the ALJ: able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, stand or walk for approximately six hours per eight-hour workday, and sit for approximately six hours per eight-hour workday. (Tr. 86). The ALJ added the further restrictions that the individual is limited to no pushing or pulling with the left upper extremity, no reaching or handling of objects with the left upper extremity, and no fingering with the left upper extremity. (Tr. 88). In response, the VE identified the representative occupation of "usher" (DOT code 344.677-014) to accommodate those limitations. (Tr. 87-88). The VE testified that there are 700 jobs regionally and 87,000 jobs nationally at the light, unskilled level for this position. (Tr. 87). When asked whether her testimony was consistent with the Dictionary of Occupational Titles (DOT), the VE responded, "It has been with the exception to my responses related to the variations in reaching and handling within the light category of exertion. . . ." (Tr. 88). The VE testified that those responses were based on her professional background, education, and experience. (Tr. 88-89). When questioned by counsel for plaintiff about the tasks of an usher besides ticket taking, the VE testified that ushers also help escort people to their seats with the assistance of a flashlight if they have trouble seeing after the show

15

starts and "shut the doors." (Tr. 89-90). When questioned on the specific task of taking tickets and ripping them in half, the VE testified:

> A: Not necessarily. I mean –
> Q: Okay.
> A: --they'll take the ticket and –
> Q: All right.
> A: -- sometimes they rip them in half, but sometimes they don't. I mean sometimes – I think no. No, they don't rip them in half. You get a receipt and a ticket when you buy a movie ticket now.

(Tr. 90). On further questioning, the VE testified that the particular occupation of usher "is grouped with other occupations within that – within that grouping. And so the numbers I've given represent the grouping, not the individual job. That's why I said it was a representative title." (Tr. 91). When asked whether there is a more limited number of actual usher positions within that category, the VE clarified, "There's (sic) five titles within that particular code. So the numbers would represent those five titles. So other titles within that are ticket taker; children's attendant at theater, . . . drive-in theater attendant and press box custodian. . . ." (Tr. 91). The VE testified that of the 700 regional jobs, the job of ticket taker would have the largest number. (*Id.*). The VE admitted that the usher job she previously identified "wouldn't represent the full 700." (Tr. 92). The VE did not clarify the numbers of jobs attributable to each of the five titles within DOT code 344.677-014.

The VE's testimony on the duties and number of usher jobs is equivocal and does not support the ALJ's finding of a substantial number of jobs for purposes of plaintiff's disability claim. Under DOT code 344.677-014, the duties of an usher include the following: "Assists patrons at entertainment events to find seats, search for lost articles, and locate facilities, such as restrooms and telephones. Distributes programs to patrons. Assists other workers to change advertising display." DOT 344.677-014, 1991 WL 672865. The DOT also clarifies that the job

16

of usher requires occasional—meaning up to one-third of a work day—reaching, handling, and fingering. *Id*. At least one court has determined that the job description of usher, which requires a worker to assist other workers to change advertising displays, "strongly suggests that at least some of the usher jobs require two functioning hands." *Phillips v. Colvin*, No. 14-C-0007, 2016 WL 1069952, at *6-7 (E.D. Wis. Mar. 18, 2016) (finding VE testimony unreliable where VE gave "no specific references to prior clients she had placed in these particular jobs, to personal knowledge or experience regarding one-handed positions, or her knowledge of employers' requirements for these [usher] positions"). *See also Marquez v. Colvin*, No. ED CV 15-1561, 2016 WL 1695368, at *3 (C.D. Cal. Apr. 27, 2016) ("The Court simply has no way of knowing – short of using its own subjective judgment – whether an usher involved in changing an advertising display . . . is required to use one, two, three, or more hands for reaching during a standard shift."); *Lee v. Astrue*, No. 6:12-CV-00084, 2013 WL 1296071, at *11 and n.5 (D. Or. Mar. 28, 2013) ("The courts are divided on the question of . . . whether 'reaching,' 'handling,' or 'fingering' in the DOT requires the ability to use both arms or hands, and there is no controlling precedent.") (citing cases). The VE appeared to acknowledge that her testimony regarding reaching and handling conflicted with the DOT,[3] but she failed to explain in what respects and the ALJ never asked for clarification. Therefore, it is not clear from the VE's testimony whether a one-handed individual could perform the usher job identified by the VE. The ALJ is required to develop the record further where, as here, the conflict between the DOT and the VE's testimony is apparent. *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009); *see also* SSR 00-4p ("If the VE's . . . evidence appears to conflict with the DOT, the adjudicator

---

[3] When asked whether her testimony was consistent with the DOT, the VE testified, "It has been with the exception to my responses related to the variations in reaching and handling within the light category of exertion" and that her responses were based on her background, education, and experience. (Tr. 88-89).

*will obtain a reasonable explanation* for the apparent conflict.") (emphasis added). In the absence of a reasonable explanation for the apparent conflict between the VE's testimony and the DOT, the ALJ erred by relying on the VE's testimony to meet the Commissioner's Step Five burden.

Moreover, the VE's testimony on the number of usher jobs that exist was equivocal. The VE acknowledged that the job of usher was one of five different job titles within DOT code 344.677-014 and she admitted that the 700 regional jobs she cited were not all usher jobs. The VE testified that of the five job titles, the job of ticket taker represented the largest of the 700 jobs. However, the VE never identified the actual number of usher jobs among the 700 jobs. Without knowing how many of the 700 jobs constitute usher jobs, the ALJ erred by relying on the VE's testimony to satisfy his Step Five burden.

Therefore, the Court finds the ALJ's disability determination is not supported by substantial evidence because he premised his Step Five finding on erroneous and equivocal VE testimony. This matter should be reversed and remanded for further proceedings.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: 6/15/16

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

ANDREW TALBERT,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-468
Dlott, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).